## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

WASHTENAW AREA
APARTMENT ASSOCIATION,
HARBOR-HILL LLC, WICKFIELD
PROPERTIES LLC, DEINCO
PROPERTIES LLC, INVESTOR'S
PROPERTY MANAGEMENT LLC,
412 HAMILTON PLACE LLC, 437
HAMILTON LLC, 507 GLEN LLC,
EWING INVESTMENT CORP., 1111
MICHIGAN LLC, J KELLER
PROPERTIES LLC, 914 WOODLAW
LLC, VARSITY MANAGEMENT
INC., ARBORSTONE PROPERTIES
LLC, ISSA PROPERTIES,
NANCYLAT LLC, MICHIGAN
RENTAL LLC, WASHINGTON
STREET APARTMENTS LLC, PTP
MANAGEMENT LLC, CABRIO
PROPERTIES LLC, CABRIO
CAMPUS PORTFOLIO LLC,
COBALT OCEAN LLC, CAMPUS
MANAGEMENT INC., RUSHDI
SALEH, SALAH ALSARRAF,
SAMAHER KARIM, and JEFFREY
POST,

   Plaintiffs,

v.

CITY OF ANN ARBOR,

   Defendant.

21-cv-

_____

## **COMPLAINT**

Plaintiffs Washtenaw Area Apartment Association ("WA3"), Harbor-Hill

LLC, Wickfield Properties, LLC, Deinco Properties, LLC, Investor's Property Management, LLC, 412 Hamilton Place, LLC, 437 Hamilton, LLC, 507 Glen, LLC, Ewing Investment Corp., 1111 Michigan, LLC, J Keller Properties, LLC, 914 Woodlawn LLC, Varsity Management Inc., Arborstone Properties LLC, Issa Properties, Nancylat, LLC, Michigan Rental LLC,  Washington Street Apartments LLC, PTP Management, LLC, Cabrio Properties, LLC,  Cabrio Campus Portfolio, LLC, Cobalt Ocean LLC, Campus Management, Inc., Rushdi Saleh, Salah Alsarraf, Samaher Karim, and Jeffrey Post (collectively, "Plaintiffs"), for their complaint against Defendant City of Ann Arbor ("the City"), state as follows:

## PARTIES

1.     Plaintiff WA3, a Michigan domestic nonprofit corporation, is an association made up of large management companies, owners, and leasing agents of residential housing in Washtenaw, Livingston, Lenawee, and Monroe Counties. WA3 has 310 members, 122 of whom lease rental property in the City. WA3 members represent 16,528 rental units in the City of Ann Arbor. As part of its mission, WA3 is committed to serve the rental housing community through a unified legislative and educational voice, as well as serving as a resource hub for Washtenaw County and the surrounding area.  Among other goals, it aims to be the leading expert and resource for the rental housing community within the areas it serves, including the City of Ann Arbor.  Many WA3 members own real property located within the

City of Ann Arbor in which they lease residential housing. WA3 brings this challenge to the City's ordinance provisions on behalf of itself and its members. WA3 members are subject to, and injured by, the City of Ann Arbor's ordinance provisions

2.      Plaintiff Harbor-Hill LLC, a Michigan limited liability company, owns 14 rental units located in the City of Ann Arbor.

3.      Plaintiff Wickfield Properties, LLC, a Michigan limited liability company, manages over 600 apartments in the City of Ann Arbor.

4.      Plaintiff Deinco Properties, LLC, a Michigan limited liability company, owns and/or manages 261 rental units in the City of Ann Arbor.

5.      Plaintiff Investor's Property Management, LLC, a Michigan limited liability company, manages 125 rental units in 81 properties in the City of Ann Arbor.

6.      Plaintiff 412 Hamilton Place, LLC, a Michigan limited liability company, owns a rental property located in the City of Ann Arbor.

7.      Plaintiff 437 Hamilton, LLC, a Michigan limited liability company, owns a rental property located in the City of Ann Arbor.

8.      Plaintiff 507 Glen, LLC, a Michigan limited liability company, owns a 4-unit apartment located in the City of Ann Arbor.

9.     Plaintiff, Ewing Investment Corp., Michigan domestic corporation, owns and manages 1 rental property in the City of Ann Arbor.

10.     Plaintiff 1111 Michigan, LLC, a Michigan limited liability company, owns two rental properties located in the City of Ann Arbor.

11.     Plaintiff J Keller Properties, LLC, a Michigan limited liability company, owns and/or manages 125 rental units located in the City of Ann Arbor.

12.     Plaintiff 914 Woodlawn LLC, a Michigan limited liability company, owns two rental houses located in the City of Ann Arbor.

13.     Plaintiff Arborstone Properties LLC, a Michigan limited liability company, owns 35 rental units in 20 buildings located in the City of Ann Arbor.

14.     Plaintiff Varsity Management Inc., a Michigan domestic corporation, owns 288 rental units in 28 buildings located in the City of Ann Arbor.

15.     Plaintiff Issa Properties, a Michigan limited liability company, owns and manages 200 rental units located in the City of Ann Arbor.

16.     Plaintiff Nancylat, LLC, a Michigan limited liability company, owns 8 rental units located in the City of Ann Arbor.

17.     Plaintiff Michigan Rental LLC, a Michigan limited liability company, owns 345 rental units located in the City of Ann Arbor.

18.     Plaintiff Washington Street Apartments LLC, a Michigan limited liability company, owns 12 rental houses and 2 apartment buildings located in the City of Ann Arbor.

19.     Plaintiff PTP Management, LLC, a Michigan limited liability company, owns 38 rental units located in the City of Ann Arbor.

20.     Plaintiff Cabrio Properties, LLC, a Michigan limited liability company, manages over 500 rental units located in the City of Ann Arbor.

21.     Plaintiff Cabrio Campus Portfolio, LLC, a Michigan limited liability company, owns 8 rental houses located in the City of Ann Arbor.

22.     Plaintiff Cobalt Ocean LLC, a California limited liability company, owns 3 rental properties located in the City of Ann Arbor

23.     Plaintiff Campus Management, Inc., a Michigan domestic corporation, manages 325 rental units located in the City of Ann Arbor.

24.     Plaintiff Rushdi Saleh owns 10 rental units located in the City of Ann Arbor.

25.     Plaintiff Salah Alsarraf owns 1 rental property located in the City of Ann Arbor.

26.     Plaintiff Samaher Karim owns 1 rental property located in the City of Ann Arbor.

27.     Plaintiff Jeffrey Post owns and/or manages 9 rental units containing a total of 133 beds located in the City of Ann Arbor.

28.     Defendant City of Ann Arbor is a Michigan municipal corporation organized under Michigan's Home Rule City Act, M.C.L. § 117.1, *et seq.*, and located in Washtenaw County, Michigan. At all times relevant to this Complaint, the City was acting under the color of state law.

## JURISDICTION AND VENUE

29.     Plaintiffs assert claims arising under the United States Constitution and 42 U.S.C. § 1983, so this Court has jurisdiction under 28 U.S.C. § 1331.

30.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because the same case and controversy gave rise to violations of the Michigan Constitution.

31.     This Court is empowered by 28 U.S.C. §§ 2201 and 2202 to grant declaratory and permanent injunctive relief, along with other forms of relief, necessary to remedy the alleged constitutional violations.

32.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1).

## FACTUAL BACKGROUND

### I.    The City's Early Leasing Provisions Violate the First Amendment

*The Early Leasing Provisions*

33.    Section 8:530 of the City's Housing Code, which restricts the rights of housing providers in Ann Arbor to show their property to prospective tenants and to enter into new lease agreements, is an unconstitutional burden on Plaintiffs' free-speech rights under the First and Fourteenth Amendments.

34.    Section 8:530(3), Entry and Leasing of Residential Premises, prohibits a "landlord" from doing the following prior to 150 days before the end of the current lease period: (i) showing their leased residential premises to a prospective tenant or (ii) entering into an agreement to rent the leased premises to another tenant for a subsequent lease period. **(Ex. A: Ordinance No. ORD-21-22.)**

35.    Section 8:530(3) reads:

> (a) A landlord shall not enter leased residential premises for the purpose of showing the premises to prospective tenants until 150 days before the end of the current lease period;
>
> (b) A landlord may not enter into an agreement to rent the leased premises to another tenant for a subsequent lease period until 150 days before the end of the current lease period.

Section 8:530(3)(a)–(b). **(Ex. A: Section 8:530(3).)**

36.    Section 8:530(3)'s prohibitions do not apply under certain limited circumstances. These include: showing leased residential premises to prospective subtenants for purposes of subletting; residential leases with a lease period of less

than 8 months; lawful proceedings to recover possession of the premises; and when the tenant has terminated occupancy and right to possession of the premises. (*See* **Ex. A: Section 8:530(5)(a)–(d).)**

37.     Section 8:530(6) imposes a civil-infraction penalty for violation of the Entry and Leasing Provision and creates a cause of action for injunctive relief or damages, or both, enforceable by a tenant aggrieved by a violation of Section 8:530. **(Ex. A: Section 8:530(6)(a)–(c).)**

38.     Absent from Ordinance No. ORD-21-22 is a description of any compelling governmental interest served by the Section 8:530(3), let alone the problem the legislation seeks to solve.

### *The Entry and Leasing Provisions Violate Plaintiffs' Free Speech Rights*

39.     The Entry and Leasing Provisions of Section 8:530 are unconstitutional content-based restrictions on commercial speech, both on their face and as applied.

40.     Under the First Amendment and Fourteenth Amendments, the City "'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 702 (6th Cir. 2020) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Regulation of speech is content-based when "a law applies to particular speech because of the topic discussed or the idea or the messaged expressed," or when it

regulates speech "by a particular subject matter" or "by its function or purpose." *Id.* at 703 (quoting *Reed*, 576 U.S. at 163–64).

41.     Content-based restrictions on speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (quoting *Reed*, 576 U.S. at 163). Under controlling Sixth Circuit case law, this strict-scrutiny test applies to content-based commercial speech. *Id.* at 706.

42.     The Entry and Leasing Provisions of Section 8:530 impose unconstitutional content-based commercial speech restrictions on Plaintiffs. Under the Entry and Leasing Provisions certain speakers (landlords) are prohibited from speaking based on content (speech related to showing their property and leasing agreements) for a particular purpose (entering into leasing agreements). The Entry and Leasing Provisions prohibit Plaintiffs from speaking on a particular topic in pursuit of a particular purpose.

43.     The restrictions are content-based because the only way to determine if there has been a violation of the ban on speech under the Entry and Leasing Provisions is to examine what a landlord said to a prospective tenant while at the landlord's property, or what was said written in communications about an agreement to rent regardless of where the communication took place.

44.     Put differently, in enacting the Entry and Leasing Provisions, the City is unconstitutionally "discriminat[ing] based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Int'l Outdoor*, 974 F.3d at 698 (quoting *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988)). The Entry and Leasing Provisions clearly mark disfavored speech (speaking to prospective tenants) and disfavored speakers (Ann Arbor landlords) for censure over lengthy periods of time.

45.     The Entry and Leasing Provisions are unconstitutional because the City cannot satisfy strict scrutiny's exacting test requiring narrow tailoring and a compelling governmental interest. The Entry and Leasing Provisions operate as a government-sponsored, coercively enforced gap order during all but the last 150 days of a lease, assuming a lease period of no less than 8 months. Indeed, under controlling law of the United States Supreme Court and the Sixth Circuit, content-based speech restrictions like these provisions are "presumptively unconstitutional." *Int'l Outdoor*, 974 F.3d at 702 (quoting *Reed*, 576 U.S. at 163).

46.     The City provided no explanation to support *any* legitimate government interest it holds in enacting the Entry and Leasing Provisions in Section 8:530, let alone a compelling government interest that would satisfy strict scrutiny.

47.     Far from a compelling governmental interest, the Entry and Leasing Provision serves a private purpose: enabling certain students at the University of

Michigan to lease rental housing on their preferred timetable. By enacting the Entry and Leasing Provisions at the behest of certain University of Michigan students, the City has exercised its police power in the service of special, private interests at the sole expense of Ann Arbor landlords. The City's decision to burden Plaintiffs' rental businesses so that a subset of tenants would have their first pick of rental properties is not a legitimate exercise of governmental power under any standard of scrutiny.

48.     The wide-ranging consequences of the Entry and Leasing Provision's ban on Ann Arbor landlord speech demonstrates how far afield the ordinance is from legitimately addressing any governmental purpose appropriately within the City's police power. The Entry and Leasing Provisions simply serve encourage off-books or black-market leasing activity. Knowing that leasing agents are banned from official leasing discussions, some would-be tenants will (and are already) resort to knocking on doors in an attempt to reach an off-books agreement on future leases. Further, the highly compressed window available to Ann Arbor landlords under the Entry and Leasing Provisions means that, in the 150-day window before most new leases begin in August, securing new leases will be even more frenzied. And during the lengthy period before the speech ban is lifted 150 days before the lease ends, Ann Arbor landlords will be unable to operate their businesses, potentially leaving fulltime employees out of work due to the City's speech ban.

49.     At bottom, the Entry and Leasing Provisions serve to censor Ann Arbor landlords for activity driven, not by the landlords themselves, but by prospective tenants expressing interest in leasing rental housing for the next lease term. The Entry and Leasing Provisions seek to curtail the market behavior of some prospective Ann Arbor tenants by prohibiting Plaintiffs from effectively operating their businesses for the majority of a lease's duration. The prohibition on Plaintiffs' commercial speech is not appropriately tailored under any standard of review, and the Entry and Leasing Provisions certainly do not clear strict scrutiny.

## II.     **The City's Tenant Screening Provision Violates Plaintiffs' Constitutional Rights**

### *The Tenant Screening Provision*

50.     The City's Code of Ordinances, Section 9:600 *et seq.*, the "Tenant Screening Provision," restricts the ability of a housing provider to inquire into a prospective tenant's criminal history. *See* Section 9:600 *et seq.* **(Ex. B: Tenant Screening Provision.)**

51.     Section 9:603 provides, subject to a limited exception in Section 9.605:

> Except as provided in section 9.605 of this Code, a housing provider shall not, at any time or by any means, whether direct or indirect, inquire about an applicant's criminal history, require an applicant to disclose criminal history, require an applicant to authorize the release of criminal history or, if such information is received, base an adverse action in whole or in part on an applicant's criminal history.

**(Ex. B.)**

- 12 -

52.    The City's stated purpose in enacting the Tenant Screening Provision is to address public and social issues related to the reintegration of previously incarcerated individuals and homelessness. Section 9:601 provides:

> The purpose of this chapter is to give previously incarcerated individuals or other individuals with a criminal history the opportunity to compete for rental housing and/or reside with family members and others. Such housing is crucial for successful reintegration into the community, obtaining gainful employment, and reducing homelessness.

**(Ex. B.)**

53.    Section 9:608 imposes a civil-infraction penalty for violation of the Tenant Screening Provision.

### *The Tenant Screening Provision Unconstitutionally Restricts Plaintiffs' Right to Exclude*

54.    The Fifth Amendment of the U.S. Constitution, applied to the states by the Fourteenth Amendment, and Article 10, § 2 of the Michigan Constitution prohibit the taking of private property for public use without just compensation. *See Brown v. Legal Found. of Washington*, 538 U.S. 216, 231–32 (2003) ("[T]he text of the Fifth Amendment imposes two conditions on the exercise of such authority: the taking must be for a 'public use' and 'just compensation' must be paid to the owner.").

55.    The Fifth Amendment's prohibition "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and

justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

56.     Laws and regulations that "result[] in a physical appropriation of property" are "*per se* taking[s]" under the Fifth Amendment. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021). A *per se* taking occurs when "the government has physically taken property for itself or someone else[.]" *Id.* (citing *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321–323 (2002)). Further, a "physical appropriation" of a property right "may constitute a taking even though no particular individual is permitted to station himself permanently upon the premises." *Id.* at 2075 (citation omitted). A law that "appropriates . . . the owners' right to exclude" is a *per se* physical taking. *Id.* at 2072–73.

57.     The Tenant Screening Ordinance is a *per se* taking because it is a "physical appropriation" of the Plaintiffs' fundamental right to exclude. *See Cedar Point*, 141 S. Ct. at 2072 ("right to exclude" is a "fundamental element of the property right" and "one of the most essential sticks in the bundle of rights" (citations omitted)); *id.* ("The right to exclude is 'one of the most treasured' rights of property ownership.'" (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982))).

58.    Under Michigan law, property owners have "the right to sell or lease or use [their] property in any lawful way." *NACG Leasing v. Dep't of Treasury*, 843 N.W.2d 891, 892 n.9 (Mich. 2014) (quoting *Attorney General v. Pere Marquette R. Co.*, 263 Mich. 431, 433; 248 N.W. 860, 860 (Mich. 1933)); *see also id.* ("Important rights flowing from property ownership include the right to exclusive possession, the right to personal use and enjoyment, the right to manage its use by others, and the right to income derived from the property." (citation omitted)).

59.    The Tenant Screening Ordinance is a *per se* taking because it physically appropriates Plaintiffs' fundamental constitutional right to exclude by prohibiting Plaintiffs from inquiring about a prospective tenant's criminal history, and forbids a housing provider from "bas[ing] an adverse action in whole or in part on an applicant's criminal history." Section 9:603. **(Ex. C.)**

60.    Alternatively, the Tenant Screening Provisions are an unconstitutional regulatory taking under the United States Supreme Court's decision in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). The ordinance is an unconstitutional regulatory taking because it burdens Plaintiffs' fundamental right to exclude and interferes with Plaintiffs' investment-backed expectations. *See id.* at 124.

61.    The Tenant Screening Provision strips a critical aspect of Plaintiffs' right to exclude. Prior to the enactment of the Tenant Screening Ordinance, Plaintiffs

used tenant screening tools like criminal background checks to verify that prospective tenants were not likely to be a danger to other residents or to the landlords' premises, and that prospective tenants would be able to fulfill their contractual rent obligations.

62.     Further, Plaintiffs' ability to screen potential tenants is important because, under Michigan law, a landlord may in some circumstances face criminal liability for the criminal acts of others. *See Bailey v. Schaaf*, 835 N.W.2d 413, 424 (Mich. 2013) (holding that in certain circumstances "a landlord has a duty to respond to [criminal acts of third parties] by reasonably expediting police involvement where it is given notice of a specific situation occurring on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee" (cleaned up)). At bottom, the Tenant Screening Provision does precisely what the Fifth Amendment forbids: "forcing some people alone"—here, Plaintiffs and Ann Arbor landlords—"to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49.

63.     The City's Tenant Screening Provision requires owners of private rental property—Plaintiffs—to privately bear a public burden. The City's stated purpose under the Tenant Screening Provisions is to promote successful reintegration of previously incarcerated individuals into the community. *See* Section

- 16 -

9:601. **(Ex. B.)** The burden of that public goal falls squarely on the shoulders of Plaintiffs and other Ann Arbor landlords.

64.     The Tenant Screening Provision harms Plaintiffs by burdening their constitutionally protected right to choose to whom they will rent and entrust their rental properties. Without access to screening information about prospective tenants, Plaintiffs face increased risks when renting their property.

65.     Plaintiffs use screening tools like criminal background histories to ensure they are entrusting their rental properties to tenants who will not only be able to fulfill their rental obligations and be responsible tenants—but also to ensure the safety of other tenants who occupy their rental buildings.

66.     Screening tools help Plaintiffs mitigate and manage potential risks at their rental properties. Plaintiffs rely on screening tools to ensure that they are renting to tenants who will not pose a danger to other residents, as well as ensuring that prospective tenants are not likely to harm Plaintiffs' businesses by causing damage or failing to pay rent and forcing costly eviction proceedings. Criminal background checks are a critical tool for community safety because not all criminal histories are equal. A background check reveals minor infractions as well as more serious crimes. A landlord also learns important information about the frequency of a prospective tenant's past criminal activity, as well as whether any violations are the result of recent behavior or whether they are long in a prospective tenant's past.

Plaintiffs do not use criminal background checks to categorically exclude any potential tenant with a violation in their background. Instead, the criminal background checks provide vital information that helps Plaintiffs lease to prospective tenants with an eye to community safety.

***The Tenant Screening Provisions Violate Plaintiffs' Substantive Due Process Rights***

67.    The Fourteenth Amendment of the United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV; *see also* Mich. Const. art 1, § 17 ("No person shall . . . be deprived of life, liberty or property, without due process of law.").

68.    The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Substantive due process "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Beydoun v. Sessions*, 871 F.3d 459, 466 (6th Cir. 2017) (quoting *Glucksberg*, 521 U.S. at 720–21).

69.     Plaintiffs' right to exclude is a fundamental right. *See Cedar Point*, 141 S. Ct. at 2072 ("right to exclude" is a "fundamental element of the property right" and "one of the most essential sticks in the bundle of rights" (citations omitted)).

70.     The Tenant Screening Provisions deprives Plaintiffs of their due process rights. Under the Due Process Clause, Plaintiffs are entitled to "heightened protection against government interference" with their fundamental right to exclude. *See Glucksberg*, 521 U.S. at 720; *Cedar Point*, 141 S. Ct. at 2072.

71.     By requiring Plaintiffs to lease their properties without considering a prospective tenant's criminal background check, the Tenant Screening Provisions deprive Plaintiffs of their fundamental right to exclude prospective tenants they deem unsafe from their properties.

72.     Laws that burden a fundamental right are subject to strict scrutiny. *Beydoun*, 871 F.3d at 466–67 (citations omitted). The Tenant Screening Provisions are not narrowly tailored to any compelling government interest.

73.     The City's Tenant Screening Provision broadly prohibits the use of *any* criminal history information in determining whether lease their property. *See* Section 9:603. The only exception in the Tenant Screening Provisions is under circumstances where federal or state law mandates background checks. *See* Section 9:605. **(Ex. B.)**

74.     The Tenant Screening Provisions provide no exceptions for serious and violent crimes—crimes that would put other tenants at risk and potentially expose Ann Arbor landlords to third-party liability.

75.     The Tenant Screening Provisions do not permit Ann Arbor landlords to distinguish between recent criminal history or a pattern of criminal history from low-level violations that occurred years ago.

76.     The City's nearly categorical prohibition on the use of screening tools is not narrowly tailored to any compelling government interest.

## COUNT I
## Declaratory and Injunctive Relief

**The Entry and Leasing Provision are unconstitutional content-based restrictions of commercial speech under the First & Fourteenth Amendments**

77.     Plaintiffs incorporate the allegations in paragraphs 1 through 76 as though fully restated herein.

78.     Under controlling law from the United States Supreme Court and the Sixth Circuit, content-based restrictions on commercial speech are presumptively unconstitutional and are subject to strict scrutiny. *See Int'l Outdoor*, 974 F.3d 702–03; *Reed*, 576 U.S. at 163.

79.     The Entry and Leasing Provision, Section 8:530(3), is a content-based restriction on commercial speech that is not narrowly tailored to compelling government interest. It is therefore unconstitutional on its face and as applied under the First and Fourteenth Amendment.

- 20 -

80.     Plaintiffs have no adequate remedy at law for the harm caused by the Entry and Leasing Provision's ban on speech. Unless the City is enjoined from enforcing the ordinance, Plaintiffs will be irreparably injured by the deprivation of their free-speech rights under the First Amendment.

WHEREFORE Plaintiffs ask this Court to declare the Entry and Leasing Provision, Section 8:530(3) unconstitutional under the First and Fourteenth Amendments, enjoin the City from enforcing the Entry and Leasing Provision, along with any other relief the Court deems appropriate.

## COUNT II
## Declaratory and Injunctive Relief

**The Tenant Screening Provision is an unconstitutional taking under the Fifth and Fourteenth Amendments of the U.S. Constitution and Michigan Constitution of 1963, art. 10, § 2**

81.     Plaintiffs incorporate the allegations in paragraphs 1 through 80 as though fully restated herein.

82.     Under controlling case law from the United States Supreme Court, regulations that "result[] in a physical appropriation of property" are *per se* takings under the Fifth Amendment. *Cedar Point*, 141 S. Ct. at 2072.

83.     The Tenant Screening Ordinance is a *per se* taking because it is a "physical appropriation" of Plaintiffs' fundamental right to exclude. *See Cedar Point*, 141 S. Ct. at 2072.

84.     The Tenant Screening Ordinance is also an unconstitutional regulatory taking under *Penn Central* because it burdens Plaintiffs' fundamental right to exclude and interferes with Plaintiffs' investment-backed expectations.

85.     Plaintiffs have no adequate remedy at law for the harm caused by the Tenant Screening Provisions. Unless the City is enjoined from enforcing the ordinance, Plaintiffs and other Ann Arbor landlords will be irreparably injured by the deprivation of their fundamental property rights under the United States and Michigan Constitutions.

WHEREFORE Plaintiffs ask this Court to declare that the Tenant Screening Provisions, Section 9:600 *et seq.*, violate the Fifth and Fourteenth Amendments and the Michigan Constitution, enjoin the City from enforcing the Tenant Screening Provisions, along with any other relief the Court deems appropriate.

## COUNT III
## Declaratory and Injunctive Relief

**The Tenant Screening Provision violates the Due Process Clause of the U.S. Constitution because it improperly interferes with Plaintiffs' fundamental rights.**

86.     Plaintiffs incorporate the allegations in paragraphs 1 through 85 as though fully restated herein.

87.     The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U.S. at 720.

88.     The Tenant Screening Provisions interfere with Plaintiffs' fundamental right to exclude and are therefore subject to strict scrutiny.

89.     The Tenant Screening Provisions violate the Due Process Clause because they are not narrowly tailored to a compelling government interest.

90.     Plaintiffs have no adequate remedy at law for the harm caused by the Tenant Screening Provisions. Unless the City is enjoined from enforcing the ordinance, Plaintiffs and other Ann Arbor landlords will be irreparably injured by the deprivation of their fundamental rights under Due Process Clause of the United States Constitution.

WHEREFORE Plaintiffs ask this Court to declare that the Tenant Screening Provisions, Section 9:600 *et seq.*, violate the Fourteenth Amendment's Due Process Clause, enjoin the City from enforcing the Tenant Screening Provisions, along with any other relief the Court deems appropriate.

## <u>COUNT IV</u>
### <u>42 U.S.C. §§ 1983, 1988</u>

91.     Plaintiffs incorporate the allegations in paragraphs 1 through 90 as though fully restated herein.

92.     Municipalities may be held liable for violations of federal law under 42 U.S.C. § 1983.  *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

- 23 -

WHEREFORE Plaintiffs ask this Court to declare that Section 8:530 and Section 9:600 *et seq.* violate federal law, enjoin the enforcement of those provisions, grant Plaintiffs' attorneys' fees and costs as authorized by 42 U.S.C. § 1988, along with any other relief the Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)   Enter an order declaring that Section 8:530, violates the First Amendment guarantees of the United States Constitution;

(b)   Enter a permanent injunction forbidding the City of Ann Arbor from enforcing the Early Leasing Provision, Section 8:530;

(c)   Enter an order declaring that Section 9:600 *et seq.* violates the Fifth and Fourteenth Amendments of the United States Constitution and the Michigan Constitution;

(d)   Enter an order declaring that Section 9:600 *et seq.* violates the Due Process Clause of the Fourteenth Amendment;

(e)   Enter a permanent injunction prohibiting the City from enforcing Section 9:600 *et seq.*

(f)   Award reasonable attorneys' fees and costs to Plaintiffs under 42 U.S.C. § 1988.

(g)   Award any other relief this Court deems just and proper.


Dated:        September 9, 2021

Respectfully submitted,

By: */s/Todd A. Holleman*
Todd A. Holleman (P57699)

- 24 -

Miller, Canfield, Paddock and Stone, P.L.C.
150 West Jefferson, Suite 2500
Detroit, MI 48226
(313) 963-6420
holleman@millercanfield.com
*Attorneys for Plaintiffs*

Dated: September 9, 2021